2018 IL App (4th) 170333

NOS. 4-17-0333

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| CHARLES MCKINNEY, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| HOBART BROTHERS COMPANY, | ) | No. 12L27 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Rebecca S. Foley, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Holder White and DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff, Charles McKinney, has mesothelioma, a disease he contracted by inhaling asbestos fibers. He brought an action against defendant, Hobart Brothers Company, for failing to warn him of the dangerousness of asbestos-containing welding rods that defendant had manufactured and to which plaintiff came in close proximity for eight months in the early 1960s. A jury returned a verdict against defendant and in his favor. Defendant appeals, arguing that the trial court should have granted its motion for judgment notwithstanding the verdict.

¶ 2        For all that appears in the record, the industry to which defendant belonged had no knowledge in the 1960s that welding rods could release asbestos fibers. Defendant could not have owed plaintiff a duty to warn of a hazard of which defendant and the industry were unaware. Because of the lack of duty, the trial court should have granted defendant's motion for judgment notwithstanding the verdict. Another reason why the court should have granted the

motion was that the record contains no evidence that the welding rods were a substantial cause of plaintiff's mesothelioma. Therefore, we reverse the trial court's judgment.

¶ 3                                I. BACKGROUND

¶ 4                          A. The Counts Against Defendant

¶ 5        On February 21, 2012, plaintiff brought this lawsuit against various defendants who are not parties to this appeal. He alleged that insulation and brakes the defendants had manufactured, distributed, or supplied had released asbestos fibers and had caused him to contract mesothelioma. Initially, defendant was not a party to this lawsuit.

¶ 6        On April 25, 2013, in two counts that plaintiff added to his complaint with the trial court's permission, he alleged that defendant, too, had caused his mesothelioma by willfully and wantonly, or at least negligently, failing to warn of the dangerousness of its product. Although, in these counts against defendant, plaintiff did not identify the allegedly dangerous product, it soon became evident that he meant Hobart 6010 welding stick electrodes, which defendant had manufactured for use in shielded metal arc welding.

¶ 7                    B. A Brief Description of Defendant's Welding Rods

¶ 8        Defendant manufactures welding rods, which, when introduced into an electrical arc, make the molten material necessary to bind two pieces of base metal together. The welding rods are made up of two parts: the steel core and the surrounding flux. Thirty years ago, the flux of defendant's "6010" rods contained chrysotile asbestos, a type of asbestos that can cause mesothelioma many years after one inhales it.

¶ 9                              C. DuPont's Testimony

¶ 10       Defendant's retained expert was John DuPont, a professor of materials science and engineering. The substance of his testimony was as follows.

¶ 11        The purpose of the flux was to protect the weld when it was still in a liquid state and to keep it clean. Keeping the molten weld clean was important because liquids could dissolve gases, which would weaken the weld. The flux burned up in the electrical arc and, in so doing, pushed the atmospheric gases out of the way, forming "a protective blanket of an inner atmosphere over the liquid pool." This was where the chrysotile asbestos in the flux served a purpose. The chrysotile asbestos was about 13% water, and as the water was released when the asbestos burned, the steam served as an "arc force," providing "deep penetration" toward the molten weld.

¶ 12        DuPont opined that, for two reasons, it was "physically impossible" for respirable asbestos fibers to have escaped from defendant's welding rods.

¶ 13        First, the asbestos fibers were encapsulated. They were chemically bound to, and completely covered by, the sodium silicate in the flux. Even if particles broke off the flux when the welding rods were removed from a box, inserted into a Stinger (an electrode holder), or stepped on, they would be particles of sodium silicate encapsulating asbestos—and none of these particles would be small enough to inhale.

¶ 14        Second, the welding arc reached a temperature of 10,000 degrees Fahrenheit, and the welding pool was at least 2700 degrees Fahrenheit. Because asbestos burned at 1500 degrees Fahrenheit, no asbestos could have been released from the welding fume.

¶ 15                            D. Frank's Testimony

¶ 16        Arthur L. Frank, a physician and professor of occupational health, was plaintiff's retained expert. Because Frank, by his own admission, was not a materials scientist, industrial hygienist, engineer, or mineralogist and had never performed, nor was qualified to perform, any fiber testing on welding rods, defendant disputed Frank's qualifications to opine on the capability

of defendant's welding rods to release respirable asbestos fibers. The trial court, however, found Frank to be sufficiently qualified and admitted his evidence deposition.

¶ 17　　　　In his evidence deposition, Frank gave an overview of literature from the 1940s onward that warned of the health hazards of asbestos. He believed that, for two reasons, defendant's welding rods were capable of giving off respirable, cancer-causing asbestos fibers. First, in his decades of experience with asbestos, Frank had never known of an asbestos-containing product that, if "properly manipulated," would not give off asbestos fibers. Second, Frank testified: "There's the work of Dr. Dement with fibers being released from welding rods."

¶ 18　　　　Frank expressed the following opinion:

"[T]o the extent that [plaintiff] worked with Hobart 6010 asbestos-containing rods or that co-workers were using them, having had prior experience with them, knowing that they give up asbestos fibers, that the exposures that he had to asbestos from those rods would have[,] in my opinion[,] been a substantial contributing cause to his mesothelioma."

¶ 19　　　　Frank conceded that the fume would have had no asbestos in it. He testified, however:

"I'm not aware of any product that contained asbestos that[,] if manipulated[,] could not give off asbestos fibers. So[,] you run from what's called [']friable['] materials that can be easily crushed by hand and release dust, so some insulation materials were like that, or a bag of raw asbestos would certainly be considered friable. But then[,] at the other end, you have asbestos cement pipe. You would think that a cement pipe would keep fibers in place. But if you saw or

cut or bevel the edges of that pipe, you will give off fibers, so anything in between is possible."

¶ 20                    E. Plaintiff's Impeachment of Hensley and the Admission
                            of the Impeaching Material as Substantive Evidence

¶ 21        Timothy Hensley was defendant's corporate representative. Plaintiff's attorney cross-examined Hensley about reports by a research scientist, Steven Compton, and other nontestifying third-party experts regarding their fiber testing of welding rods—even though Hensley had never mentioned these reports on direct examination. (We will follow plaintiff's lead by calling these third-party reports "the Compton studies," even though, strictly speaking, they were not all by Compton.) Defendant's attorney objected on the ground of hearsay and a lack of foundation. In response to the objection, plaintiff's attorney assured the trial court that he was merely impeaching Hensley and that, "[a]s far as the studies actually going to the jury, they won't." The court overruled the objection, and plaintiff's attorney continued cross-examining Hensley on the Compton studies.

¶ 22        On redirect examination, defendant's attorney questioned Hensley in more detail about the Compton studies, with the intention of exposing their flaws and unreliability. During his redirect examination, he displayed pages from the Compton studies on a large screen, an "Elmo," so the jury could follow along.

¶ 23        Because defendant's attorney had displayed or "published" the Compton studies to the jury on redirect examination, the trial court agreed with plaintiff's attorney that they should be admitted in evidence and should be included in the jury folder, which went back to the jury during its deliberations.

¶ 24                                    F. Plaintiff's Testimony

¶ 25            For eight months in 1962 and 1963, plaintiff worked at Portable Elevator, in Bloomington, Illinois. For seven of those eight months, his job was spot-welding, using an acetylene torch and bronze brazing rods. In addition to employing torch welders, such as plaintiff, Portable Elevator employed stick or arc welders, who used Hobart 6010 welding rods—all of which contained asbestos before 1979.

¶ 26            Plaintiff worked on the second floor, and the stick welders worked on a grated mezzanine, above, which was accessed by an open, wooden stairway. The stick welders' used welding rods—the stubs—would fall through the grated mezzanine floor, onto the second floor, where defendant worked. The workplace was dirty.

¶ 27            Each day at work, plaintiff took two 15-minute breaks in the break room, which was upstairs, on the mezzanine. To get to the break room, he had to climb the steps and walk by the stick welders, over the mezzanine floor littered with stubs. The break room had no door. It was just an open space, with a picnic table, where workers could sit.

¶ 28            When walking by the stick welders, defendant saw boxes of welding rods. The boxes had "HOBART" and "6010" on them. He did not know, at the time, that the welding rods contained asbestos.

¶ 29                            G. Plaintiff's Exposure to Asbestos as a Mechanic

¶ 30            For over 40 years, plaintiff was an automobile mechanic, and, in that occupation, he worked on brakes that contained asbestos. According to his physician, Bradley Smith, he had a "history of asbestos exposure [from] working with brake shoes *** in the past." Frank opined that plaintiff's exposure to asbestos from installing brakes "would have been a substantial contributing factor to [his] developing *** mesothelioma."

¶ 31                                    II. ANALYSIS

¶ 32                      A. Defendant's Arguments Against Frank's Testimony

¶ 33                         1. *The Claimed Violation of Rule 213(f)(3)(ii)*

¶ 34          Frank was a " 'controlled expert witness' " within the meaning of Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007) in that he was plaintiff's "retained expert." Therefore, "[u]pon written interrogatory," plaintiff was obligated to provide defendant with "the conclusions and opinions of" Frank (among other items of information). Ill. S. Ct. R. 213(f)(3)(ii) (eff. Jan. 1, 2007). It appears to be undisputed that defendant served upon plaintiff a timely Rule 213(f) interrogatory. Plaintiff responded with a supplemental interrogatory answer, which, after listing Frank's qualifications, stated as follows:

> "Dr. Frank will testify regarding latency of disease, asbestos, asbestos fiber types, and the propensity of the various asbestos fibers to cause disease in humans, including carcinogenicity (lung cancer, mesothelioma[,] and other cancers). Dr. Frank will testify that [plaintiff's] mesothelioma was caused by his exposures to asbestos, including exposures to asbestos from the products of all defendants. Dr. Frank will also testify with respect to issues related to 'state of the art.'
>
> Dr. Frank is expected to testify consistent[ly] with testimony he has given in this, and other cases, in central Illinois asbestos litigation. The transcript of his deposition given on November 12, 2012, in this case, is available for [d]efendants upon request."

¶ 35          The first and third sentences of this interrogatory answer consist of "subject matter" (Ill. S. Ct. R. 213(f)(3)(i) (eff. Jan. 1, 2007)), not "conclusions and opinions" (Ill. S. Ct. R. 213(f)(3)(ii) (eff. Jan. 1, 2007)). The only explicit conclusion or opinion is in the second

sentence: "Dr. Frank will testify that [plaintiff's] mesothelioma was caused by his exposures to asbestos, including exposures to asbestos from the products of all defendants." The final sentence of the interrogatory answer states that Frank will "testify consistent[ly]" with his discovery deposition, but, on November 12, 2012, when Frank gave his discovery deposition, defendant was not yet a party to this case, and Frank had no occasion to discuss welding rods at that time. Thus, the only disclosed conclusion or opinion was that defendant's asbestos-containing products had caused plaintiff's mesothelioma.

¶ 36    The supreme court has stated that Rule 213 disclosures must "drop down to specifics" (internal quotation marks omitted) (*Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004)), and it would be difficult to imagine a more general disclosure than the bare statement that defendant's products caused plaintiff's mesothelioma. Under Illinois Supreme Court Rule 213(g) (eff. Jan. 1, 2007), "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition, limits the testimony that can be given by a witness on direct examination at trial." Defendant argues that, because "Frank's opinion that welding rods [could] release asbestos fibers was not disclosed before his videotaped evidence deposition," the trial court should have granted defendant's motion to bar plaintiff from presenting to the jury the portion of Frank's evidence deposition in which he expressed that opinion. See Ill. S. Ct. R. 219(c)(iv) (eff. July 1, 2002); *Sullivan*, 209 Ill. 2d at 110 ("Where a party fails to comply with the provisions of Rule 213, a court should not hesitate sanctioning the party, as Rule 213 demands strict compliance." (Internal quotation marks omitted.)).

¶ 37    Plaintiff counters that an expert witness may testify to logical corollaries of a Rule 213(f)(3)(ii) disclosure (see *Skubak v. Lutheran General Health Care Systems*, 339 Ill. App. 3d 30, 39 (2003)) and that the ability of defendant's welding rods to release respirable asbestos

fibers was a logical corollary of the disclosure that "[plaintiff's] mesothelioma was caused by his exposures to asbestos, including exposures to asbestos from the products of all defendants."

¶ 38 We agree. It is commonly known that mesothelioma is caused by the inhalation of asbestos fibers. It logically follows that, if defendant's asbestos-containing welding rods were a cause of plaintiff's mesothelioma (as Frank was expected to opine), the welding rods necessarily released respirable asbestos fibers and plaintiff inhaled them. Therefore, the trial court was within its discretion in finding no sanctionable violation of Rule 213(f)(3)(ii) *in that respect*. See *Sullivan*, 209 Ill. 2d at 109; *Madden v. Scott*, 2017 IL App (1st) 162149, ¶ 23 ("[W]e will address only the specific arguments which they have made.").

¶ 39 2. *The Reliability of Frank's Methodology*

¶ 40 In defendant's view, "Frank's fiber-release opinion was *** inadmissible because it was not the product of a reliable methodology." Frank's methodology, according to defendant, was to reason simply that defendant's welding rods must have released respirable asbestos fibers because Frank had never seen any asbestos-containing product that, if "properly manipulated," would not do so.

¶ 41 Frank admitted that "[t]he asbestos content of a product [was] not necessarily an indication of its relative health risk," given that, "[f]or many products, the fibers [were] tightly bound to the matrix or [were] encapsulated." Even so, he noted, "[a] potential health risk [arose] when asbestos fibers [were] set free, for example, during drilling or sawing of asbestos cement sheets."

¶ 42 Plaintiff's attorney asked Frank:

"Q. Doctor, the jury has heard the term [']encapsulation.['] And have you encountered encapsulated products that[,] even when manipulated[,] gave off no fibers?

\* \* \*

A. No, I've never seen a product that's encapsulated or any product that[,] if properly manipulated[,] wouldn't give off free asbestos fibers."

Later in his evidence deposition, Frank again testified:

"A. I'm not aware of any product that contained asbestos that[,] if manipulated[,] could not give off fibers. So[,] you run from what's called [']friable materials['] that can easily be crushed by hand and release dust, or some insulation materials were like that, or a bag of raw asbestos would certainly be considered friable. But then[,] at the other end[,] you have asbestos cement pipe. You would think that a cement pipe would keep fibers in place. But if you saw or cut or bevel the edges of that pipe, you will give off fibers, and so anything in between is possible."

¶ 43　　　　Defendant argues: "The mere fact that Dr. Frank personally had 'never seen' other products that did not release asbestos fibers despite containing asbestos says nothing about whether welding rods can release asbestos fibers, especially given Dr. Frank's lack of expertise on that question." Defendant quotes the First District: "While testimony grounded in expert analysis of the known physical facts is welcomed, conclusory opinions based on sheer, unsubstantiated speculation should be considered irrelevant" and incapable of satisfying a plaintiff's burden of proof. (Internal quotation marks omitted.) *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 293 (2008).

¶ 44    We agree it would be "sheer, unsubstantiated speculation" (*id.*) to conclude that, simply because other asbestos-containing products, such as cement pipes, released respirable asbestos fibers when they were sawed, cut, or beveled, defendant's welding rods released respirable asbestos fibers when they were jostled around in a packing box, dropped, or stepped on.

¶ 45    Plaintiff points out, however, that Frank also relied on a welding-rod study by someone named Dement. Defendant's attorney asked Frank in his evidence deposition:

> "Q. *** Have you brought any kind of—or may I see the documentation upon which you rely for saying there's release of asbestos fibers from—
>
> A. You and I just—
>
> A.—asbestos-containing welding rods?
>
> Q. I didn't bring any such literature with me. I'm sure you have it. You and I have discussed this many times in the past. There's the work of Dr. Dement with fibers being released from welding rods."

¶ 46    An expert witness, such as Frank, may rely on "facts or data" gathered by experts in other specialties. Ill. R. Evid. 703 (eff. Jan. 1, 2011). Although an expert witness may not parrot another expert's opinion if that opinion represents an exercise of professional discretion or judgment (see *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002); *Citibank, N.A. v. McGladrey & Pullen, LLP*, 2011 IL App (1st) 102427, ¶ 21 (adopting *Dura*)), expert witnesses commonly rely on facts or data gathered by experts in other specialties—for example, "an X ray or other laboratory analysis which is typically performed by a technician or laboratory scientist other than the testifying expert" (*Kurrack v. American District Telegraph Co.*, 252 Ill. App. 3d 885, 897-98 (1993)).

¶ 47 Of course, the third-party technician on which the expert relies must be trustworthy. Plaintiff had the burden of laying a foundation for Frank's expert opinion by showing not only that Frank himself was qualified but also that his reliance on Dement's work was (1) customary in Frank's field and (2) reasonable. See *Connelly v. General Motors Corp.*, 184 Ill. App. 3d 378, 391 (1989); see also *City of Chicago v. Anthony*, 136 Ill. 2d 169, 186 (1990); *Lovelace v. Four Lakes Development Co.*, 170 Ill. App. 3d 378, 384 (1988). Defendant does not argue that plaintiff failed to lay that foundation. In fact, in its reply brief, defendant does not respond at all to plaintiff's argument that Frank relied on Dement's work. See *Department of Central Management Services/The Department of State Police v. Illinois Labor Relations Board, State Panel*, 2012 IL App (4th) 110356, ¶ 26 ("We note the Department did not file a reply brief, and thus it did not respond to the Board's forfeiture argument. Accordingly, we find the Department has forfeited any argument based on the labor-nexus test."); *Holder v. Caselton*, 275 Ill. App. 3d 950, 959 (1995) (The "plaintiff appears to concede that point in her reply brief by failing to respond."). Because defendant, by its silence, appears to concede the customariness and reasonableness of Frank's reliance on Dement's work with welding rods, we find no abuse of discretion in the admission of Frank's testimony that defendant's welding rods could release respirable asbestos fibers when "properly manipulated." See *Anthony*, 136 Ill. 2d at 186.

¶ 48 B. The Admission of the Compton Studies as Substantive Evidence

¶ 49 Citing *Costa v. Dresser Industries, Inc.*, 268 Ill. App. 3d 1, 11 (1994), defendant argues that, by using third-party, nontestifying expert reports, namely, the Compton studies, to impeach Hensley or to prove notice to defendant that welding rods were capable of releasing asbestos fibers, plaintiff "did not elicit substantive evidence of fiber release in this case."

¶ 50　　　　Plaintiff agrees. He writes: "Plaintiff did not use the [Compton studies] as substantive evidence of fiber release." Plaintiff continues, however: "It was only after [defendant] published the reports to the jury and went over them in detail with Hensley that [p]laintiff asked to have the reports admitted. [Citations.] Any error in admitting the Compton studies as evidence rests squarely on the shoulders of [defendant] ***."

¶ 51　　　　This reasoning is not quite fair to defendant. After all, defendant objected to the Compton studies on the ground of hearsay. In opposition to the hearsay objection, plaintiff cited *Piano v. Davison*, 157 Ill. App. 3d 649 (1987), in which the appellate court held it was permissible for an expert to testify about a report the expert had reviewed in reaching his or her opinion, even if the expert had chosen not to rely on the report (*id.* at 672; see also *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 105 (1995)). The trial court overruled defendant's hearsay objection, thereby signifying its agreement with plaintiff that the Compton studies were not offered for their truth or as substantive evidence. See Edward J. Imwinkelried, *Rationalization and Limitation: The Use of Learned Treatises to Impeach Opposing Expert Witnesses*, 36 Vt. L. Rev. 63, 70-71 (2011) (because the hearsay rule forbids the text to be offered for its truth, the text must be used for impeachment: to show, for example, that the witness's disregard or hasty rejection of the text is indicative of carelessness or bias). But *cf. People v. Virgin*, 302 Ill. App. 3d 438, 448 (1998) ("Where a witness is impeached by a contradictory statement made out of court by another person, as opposed to by the witness himself, then the out-of-court statement is offered for its truth in order to attack the credibility of the witness. Unlike impeachment by self-contradiction, in this type of impeachment [i]t is not the contradiction but the truth of the contradicting assertion *** that constitutes the probative end." (Internal quotation marks omitted.)).

Defendant had the right to proceed on that premise and to attempt to neutralize the impeachment without transforming the Compton studies into substantive evidence.

¶ 52    The supreme court has explained:

"[A] party waives the right to raise as error action taken by the court at the instance of that party; it is quite another matter when, after an exclusionary motion is denied, the party himself raises a matter so as to lessen its impact, when the party knows that[,] if he does not raise it, the opponent will. The difference is that, in the first instance, the request and the subsequent assertion of error are inconsistent with one another. In the second instance[,] the aim is consistent: once the motion to exclude the matter is denied, the party must try to limit the effect the matter will have on the trier of fact. He has not waived the issue by raising it; he has merely tried to ensure that it does the least damage to his witness'[s] credibility." *People v. Spates*, 77 Ill. 2d 193, 199-200 (1979).

After the trial court overruled defendant's hearsay objection, defendant did not waive its objection by its subsequent good-faith efforts at damage control. See *Department of Transportation v. Quincy Coach House, Inc.*, 64 Ill. 2d 350, 359 (1976); *Morrison v. Community Unit School District No. 1, Payson*, 44 Ill. App. 3d 315, 318-19 (1976); *Apa v. National Bank of Commerce*, 374 Ill. App. 3d 1082, 1088 (2007). A party need not stand on an overruled objection; the party may follow the law as laid down by the trial judge and offer similar evidence without forfeiting its objection. *Chicago City Ry. Co. v. Uhter*, 212 Ill. 174, 182 (1904).

¶ 53    In sum, then, the Compton studies were not substantive evidence that defendant's welding rods could have released respirable asbestos fibers. The redirect examination did not forfeit the hearsay objection and did not make the Compton studies admissible as substantive

evidence. See *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 469 (1992) (upholding the denial of a motion for judgment notwithstanding the verdict because "the jury verdict is properly and adequately supported by *competent* evidence" (emphasis added)); *Bartlett Bank & Trust Co. v. McJunkins*, 147 Ill. App. 3d 52, 62 (1986) ("When deciding a motion for judgment *n.o.v.*, the court may consider only the *competent* evidence introduced at trial." (Emphasis added.)).

¶ 54        Frank's testimony, however, was substantive evidence that defendant's welding rods could have released respirable asbestos fibers. He testified: "[T]o the extent that plaintiff worked with Hobart 6010 asbestos-containing rods or that co-workers were using them, having had prior experience with them, *knowing that they give up asbestos fibers*, that the exposures he had to asbestos from these rods would have[,] in my opinion[,] been a substantial contributing cause to his mesothelioma." (Emphasis added.) So, we disagree with defendant that the record lacked *any* competent evidence that defendant's welding rods were capable of releasing asbestos.

¶ 55        Granted, DuPont testified that any fragments that broke off the welding rods would have been 100 microns at the smallest and, thus, would have been too small to be inhaled. The jury, however, could have believed Frank over DuPont. We defer to the jury's determination of the credibility of witnesses and to its weighing of the evidence. See *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 89 (2002) (in reviewing the ruling on a motion for judgment notwithstanding the verdict, the reviewing court may not substitute its judgment for the jury's, nor may the reviewing court reweigh the evidence or determine the credibility of the witnesses).

¶ 56          C. No Duty to Warn of What is Contemporaneously Unknown to the Industry

¶ 57          The amended complaint had two counts against defendant. Count V alleged that defendant "was willful and wanton" in failing to warn plaintiff of the dangers of asbestos, and count VI alleged that defendant was negligent in failing to do so.

¶ 58          Defendant argues:

> "But the record was devoid of any evidence that any manufacturer should have reasonably foreseen that the use of *asbestos-containing welding rods in particular* might pose a risk of exposing coworkers in the same building to respirable asbestos fibers. At most, the evidence at trial showed that [defendant] did not become aware of the potential risk of asbestos until the early 1970s, nearly a decade *after* plaintiff's purported exposure, and that evidence pertained to the potential risk posed to individuals working directly with raw asbestos, not bystanders to the finished welding[-]rod product like plaintiff." (Emphases in original.)

Defendant notes that, in *Woodill v. Parke Davis & Co.*, 79 Ill. 2d 26, 35 (1980), the supreme court imposed a knowledge requirement in failure-to-warn cases: the plaintiff had to "prove that the defendant manufacturer knew or should have known of the danger that caused the injury." It is true that, in *Woodill*, the plaintiffs brought an action for strict products liability (*id.* at 28) whereas, in the present case, plaintiff alleges that defendant was negligent (or willful and wanton). However, that makes no difference—the two legal theories of liability have the same knowledge requirement. "[L]iability based upon a failure to warn adequately of dangers (Restatement (Second) of Torts [§] 402A, comment *j* (1965)) is itself a doctrine borrowed from

negligence." *Id.* at 33. It follows that, regardless of whether the failure-to-warn case sounds in strict liability or negligence, the inquiry is the same:

> "The inquiry becomes whether the manufacturer, because of the 'present state of human knowledge' (Restatement (Second) of Torts [§] 402A, [cmt.] *k* (1965)), knew or should have known of the danger presented by the use or consumption of a product. Once it is established that knowledge existed in the industry of the dangerous propensity of the manufacturer's product, then the plaintiff must establish that the defendant did not warn, in an adequate manner, of the danger." *Id.* at 35.

¶ 59        Thus, even if (as the jury impliedly found) it was an objective fact that defendant's welding rods could release respirable asbestos fibers by being stepped on or by being jostled against one another in a box or a stub bucket, defendant had a duty to warn plaintiff in 1962 and 1963 only if, during those years, defendant knew or should have known that its welding rods could release respirable asbestos fibers by being so manipulated and that someone could become ill as a result. "A duty to warn of a particular hazard will be imposed only where there is unequal knowledge, either actual or constructive, *and the defendant knows or should know that injury may occur if no warning is given*." (Emphasis added.) *Carrizales v. Rheem Manufacturing Co.*, 226 Ill. App. 3d 20, 25 (1991) (negligence action). What defendant should have known comes down to what was known in the industry of which defendant was a part. See *Woodill*, 79 Ill. 2d at 35.

¶ 60        Because the industry got whatever knowledge it had from literature and because the existence and contents of the literature are undisputed, our standard of review on the question of duty is *de novo*. See *Thompson v. Gordon*, 241 Ill. 2d 428, 438-39 (2011) ("Whether a duty is

owed presents a question of law for the court to decide, while breach of duty and proximate cause present questions of fact for the jury to decide."); *Kokoyachuk v. Aeroquip Corp.*, 172 Ill. App. 3d 432, 439 (1988) ("The determination of whether a duty to warn exists is normally a question of law; however, when the record is in dispute, it becomes a question of fact."). Therefore, we will decide *de novo* whether defendant had a duty, in 1962 and 1963, to warn plaintiff of its product. Again, the existence of such a duty depends on whether, in 1962 or 1963, "knowledge existed in the industry of the dangerous propensity of *the manufacturer's product*"—which, in this case, was not raw asbestos but defendant's welding rods, in which asbestos was encapsulated. (Emphasis added.) See *Woodill*, 79 Ill. 2d at 35.

¶ 61        Plaintiff tends to blur this distinction. He argues:

> "Defendant's claim in its brief that '[a]t most, the evidence at trial showed that [defendant] did not become aware of the potential risk of *asbestos* until the early 1970s is fiction. [Citation.] In fact, [d]efendant tacitly admitted it knew of the hazards of *asbestos* as early as 1947, if not earlier. [Citations.] Dr. Frank—the only state[-]of[-]the[-]art witness to testify—testified the medical and scientific literature definitively established *asbestos* as the cause of mesothelioma by 1960. [Citation.]" (Emphases added.)

Other than distinguishing a case that defendant cites, *In re Estate of Holmes*, 2011 IL App (4th) 100462, on the ground that it pertained to take-home exposure rather than workplace exposure, that is the only argument plaintiff makes for imposing a duty to warn on defendant. We will examine, one by one, the citations to the record in the above-quoted passage from plaintiff's brief. There are six such citations, each of which is to testimony.

¶ 62          First, according to Hensley's testimony, defendant believed it had bought the chrysotile asbestos it had used in its welding rods from Johns Manville Corporation or Carey Canadian Mines. Employees in defendant's research department would "make sure that they had the proper raw materials in order to make whatever kind of flux they needed for the rods that were being made." To that end, they "would research the various raw materials." Plaintiff's attorney asked Hensley:

> "Q. And they'd sort of keep up on various information related to all of the various raw materials, whether it be asbestos or anything else, so that they're aware of what was being discussed in science and medicine in both those different ingredients, right?
>
> A. That's true."

¶ 63          Second, Hensley testified that, "over the years," defendant had done "abatement" in its own buildings, to remove or contain asbestos—"because the way [defendant] treats asbestos nowadays is they treat it as a hazard." From 1939 to 1981, defendant had engineers who "would keep up on the literature as it related to the raw materials, including asbestos."

¶ 64          Third, Hensley testified that asbestos was one the raw materials defendant used in manufacturing "a few of the rods." Plaintiff's attorney asked him:

> "Q. Okay. And as you told us today, the engineers would keep up on the literature as it related to those raw materials, including asbestos[,] right?
>
> A. Yes, and we tried to.
>
> Q. So[,] if there were articles in the literature that discussed asbestos being harmful, that's something the engineers would have noticed[,] right?
>
> A. They may have.

- 19 -

Q. Okay. If there were articles in the literature that discussed health effects from breathing asbestos or from asbestos coming out of products, those are the kind of things they would have looked at[,] right?

A. They may have."

¶ 65   Fourth, Hensley testified he was unsure if the engineers "found every piece of literature out there." Plaintiff's attorney asked him:

"Q. But one of the things you know was that they were trying, when they searched the literature, to find out what was out there about the hazards of the raw materials, the hazards to the welders, the people that used the ultimate product; correct?

A. Yes."

¶ 66   Fifth, Hensley testified that, "at least by 1971," defendant knew that asbestos was dangerous to breathe. He could not rule out that defendant knew of the dangerousness of asbestos as early as 1947.

¶ 67   Sixth, Frank testified that, in 1942, a medical doctor, W.C. Hueper, warned of the toxicity of asbestos, in his book Occupational Tumors and Allied Diseases.

¶ 68   Photocopied pages from Hueper's book are in the record as plaintiff's exhibit No. 967. After describing the types of asbestos and where it was mined, Hueper noted in his book that "[t]he production of asbestos ha[d] risen enormously in recent years," mostly because of its use in the automobile industry but also because it was used in a variety of other products, including fire-resistant clothes, blankets, curtains, thread, and rope; filter cloths; millboard; wallboard; shingles; tile; mortar; insulation for steam pipes, water pipes, and boilers; brake linings; paper; and mattresses.

¶ 69        Hueper was concerned about the well-being of the thousands of factory workers who made those products. He wrote:

> "The chief hazard consists in the inhalation of asbestos dust, which is produced abundantly during the preparation of the mineral for the spinning process (purification and removal of stony impurities) and during other phases of the production and manufacturing process of asbestos and asbestos containing goods. Direct contact of the skin with asbestos is of minor importance."

Direct contact with the skin could cause "painful warts formed around the asbestos needles," but a far more serious threat was pulmonary lesions, *i.e.*, asbestosis, "resulting from a prolonged occupational inhalation of asbestos dust and fibrils." Worse still, there were troubling signs that the pulmonary lesions could turn into cancer.

¶ 70        Because "[a]sbestosis carcinoma of the lung [was] not included in any group of occupational tumors recognized by any country," and because "several of the states with many large asbestos plants [did] not include asbestosis among compensatory occupational hazards," and because "the evidence presented [was] sufficiently serious," Hueper called for an "extensive clinical, statistical, and experimental investigation of the incidence and causative interrelation of asbestosis and pulmonary carcinoma." In the meantime, he recommended that "measures *** be taken to eliminate or reduce the existing hazard caused by the inhalation of asbestos dust," such as setting up a "closed production system, whenever possible"; misting the air to suppress the asbestos dust; establishing "an extensive and efficient exhaust ventilation"; "the wearing of respirators by workers engaged in dusty operations"; and "mechanization of operations *** to reduce the number of workers exposed." He reiterated that "[t]he dust hazard [was] most

pronounced in store rooms for raw material[;] in rooms in which the raw materials [were] handled[;] and in spinning, weaving, mixing, and filling rooms."

¶ 71       Plaintiff's attorney asked Frank if, "[a]fter Hueper's text, *** there were more articles or texts that came out about asbestos and disease." Frank answered:

"A. Hundreds, if not thousands of them, came out after that. ***

There was an epidemiological study from Dr. Doll in 1955 relating to lung cancer and asbestos, and in 1960 Dr. Wagner in South Africa showed that not only miners could get mesotheliomas but their family members could get it and people living in the villages near the mines where the asbestos was mined could get mesotheliomas. And so the other cancers have been looked at over the years.

* * *

Q. Of the diseases we've been talking about so far today, are you saying by 1960, asbestosis, lung cancer, and mesothelioma were all recognized to be caused by asbestos in some cases?

A. Absolutely.

Q. Mesothelioma was 1960, and—and the South African article, was that the first one ever reported in the literature about—you said it was a rare tumor?

A. No. There was actually a paper by one of my teachers from Mount Sinai, Dr. Rabin. In 1931 he reported on a mesothelioma. *** But he in no way related it to asbestos.

The first relationship to asbestos was a report of a mesothelioma in Germany in 1938. There was a plumber that was reported as having developed a

- 22 -

mesothelioma from working with asbestos-containing plumbing materials in 1944 here in the United States."

¶ 72    The foregoing cited testimony by Hensley and Frank (along with Hueper's book, referenced in Frank's testimony) is indeed evidence that, in 1962 and 1963, "knowledge existed in the industry of the dangerous propensity of" raw asbestos. See *Woodill*, 79 Ill. 2d at 35. Their testimony, however, is not evidence that, in 1962 or 1963, "knowledge existed in the industry" (*id.*) that defendant's *product*—the Hobart 6010 welding rod—was harmful. That is a crucial distinction. It must be "established that knowledge existed in the industry of the dangerous propensity of *the manufacturer's product*." (Emphasis added.) *Id.* The manufacturer was defendant, and defendant's product was not asbestos but welding rods, in which asbestos was encapsulated. The record appears to contain no evidence of contemporaneous knowledge in the industry that welding rods with asbestos encapsulated in the flux were hazardous. See *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1145 (5th Cir. 1985) ("The manufacturer is not liable for failure to warn of dangers unforeseeable at the time it manufactured the product. [The plaintiff] introduced no proof that [the defendant manufacturer] knew or should have known that its asbestos-containing products could cause harm. Construed most favorably to [the plaintiff], his evidence demonstrated only that [the defendant] knew that the inhalation of asbestos fibers in certain concentrations might create a health hazard."). Plaintiff's own expert witness, Frank, testified (or, more precisely, agreed): "The asbestos content of a product is not necessarily an indication of its relative health risk. For many products, the fibers are tightly bound to the matrix or encapsulated."

¶ 73    Nor, in 1942, did Hueper opine that asbestos-containing products were dangerous *per se* to consumers. If he thought that such products were dangerous *per se* in their finished

- 23 -

state, he surely would not have recommended that ameliorative measures be taken for workers in factories so that the manufacture of asbestos-containing products could, with more safety, continue. Plaintiff cites no evidence justifying the conclusion that defendant knew, or should have known, in 1962 or 1963, that merely stepping on its welding rods, dropping them, inserting them into a Stinger, or jostling them around in a box or bucket would release asbestos fibers from their encapsulation in the flux.

¶ 74　　　In sum, the existence of a duty is an essential element of plaintiff's cause of action, and, in 1962 and 1963, defendant could not have owed plaintiff a duty to warn plaintiff of a hazard that, at that time, was unknown to the industry to which defendant belonged, namely, the ability of its welding rods to release encapsulated asbestos fibers if the welding rods were simply rubbed together or stepped on. See *Holmes*, 2011 IL App (4th) 100462, ¶ 24. The record appears to contain no evidence of such contemporaneous knowledge in the industry. If the record contained conflicting evidence on contemporaneous knowledge, cases suggest that a duty to warn would be a question of fact (see *Klen v. Asahi Pool, Inc.*, 268 Ill. App. 3d 1031, 1035 (1994); *Kokoyachuk*, 172 Ill. App. 3d at 439), but the record contains no evidence at all of contemporaneous knowledge. The resulting lack of duty entitled defendant to a judgment notwithstanding the verdict. See *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 22 ("Where a plaintiff has obtained recovery against a defendant based on negligence, and if the defendant did not owe the plaintiff a duty, then a judgment *n.o.v.* in favor of the defendant is required.").

¶ 75　　　　　D. The Lack of Any Evidence of Substantial Causation

¶ 76　　　Assuming, merely for the sake of argument, that industry knowledge, in the early 1960s, that *raw asbestos* was dangerous to breathe justifies imposing on defendant a

- 24 -

contemporaneous duty to warn of the *asbestos encapsulated in its welding rods*, the record appears to contain no evidence that the welding rods were "a material element and a substantial factor in bringing *** about" plaintiff's mesothelioma. See *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 354-55 (1992).

¶ 77 In *Thacker*, 151 Ill. 2d at 364, the supreme court "agree[d] with the appellate court that[,] in order for the plaintiff to prevail on the causation issue[,] there must be some evidence that the defendant's asbestos was put to 'frequent' use in the Bloomington facility in 'proximity' to where the decedent 'regularly' worked." It is important to keep in mind that, in that passage in *Thacker*, the supreme court was discussing "the defendant's *asbestos*" (emphasis added) (*id.*)—that is, bags of "raw asbestos" (*id.* at 350)—not a finished product, such as defendant's welding rods, in which asbestos was encapsulated. Proving merely that plaintiff came into frequent, close, and regular contact with welding rods manufactured by defendant would not, on the logic of *Thacker*, prove substantial causation any more than proving he routinely walked on floor tiles containing asbestos would prove substantial causation.

¶ 78 The supreme court stated in *Thacker*: "[T]he plaintiff here cannot meet her burden of production unless and until she is able to point to sufficient evidence tending to show that Manville asbestos was actually inhaled by the decedent." *Id.* at 364. Likewise, plaintiff must prove he actually inhaled respirable asbestos fibers from defendant's welding rods—and that he inhaled enough of the fibers that one could meaningfully say the welding rods were a "*substantial* factor" in causing his mesothelioma (emphasis added) (see *id.* at 354-55). The causal criteria of frequency, proximity, and regularity are calculated to insure that the defendant's contribution to the plaintiff's loss was more than trivial (*Nolan v. Weil-McLain*, 233 Ill. 2d 416, 432 (2009)).

¶ 79        Plaintiff argues he met the criteria of frequency, proximity, and regularity in *Thacker*. He claims the following facts are undisputed:

> "[Plaintiff] worked for eight months at Portable Elevator. [Citation.] Stick welders there used [defendant's] asbestos-containing 6010 rods. [Citation.] [Plaintiff's] workstation was below a grated mezzanine where the welders worked. [Citation.] He frequently walked past and sat next to the welders while they worked. [Citation.] The welders did not keep a clean work area. [Defendant's] asbestos welding rods littered the ground[,] where [plaintiff] and others stepped on them. [Citation.] They fell through the grates of the mezzanine into [plaintiff's] work area. Portable Elevator did not have any dust control measures. [Citation.] Nothing stopped the asbestos dust generated on the mezzanine from drifting into and circulating throughout [plaintiff's] work area. [Citation.] [Plaintiff] was exposed continuously to asbestos dust from [defendant's] welding rods for almost eight months."

¶ 80        The cited pages of the record do not always substantiate the factual representations plaintiff makes in that quoted passage. Plaintiff represents that his "workstation was below a grated mezzanine where the welders worked." It is true that, according to plaintiff's testimony, the welders worked on the third floor and plaintiff worked on the second floor. Plaintiff's attorney asked him, however:

> "Q. When you were down on two and you were working and there was a—were you working underneath where there was a grated floor?
>
> A. I wasn't directly under it. It was off to the side for—where we had our stand. Could just look right up and see it."

¶ 81        Plaintiff also represents that the welding rods "fell through the grates of the mezzanine into [plaintiff's] work area." There is no citation to the record for that sentence. We see, in the transcript, where plaintiff testified that the "stubs from the arc welders on the third floor" fell through the grates of the mezzanine and onto the second floor. We do not see, however, where he testified that the stubs fell into his work area. It is difficult to picture how they could have done that, since, according to his testimony, his work area was "off to the side."

¶ 82        Plaintiff also represents: "Nothing stopped the asbestos dust generated on the mezzanine from drifting into and circulating throughout [plaintiff's] work area. [Citations.] [Plaintiff] was exposed continuously to asbestos dust from [defendant's] welding rods for almost eight months." At the cited pages of the trial transcript, we see no reference to dust, let alone asbestos dust. Granted, a few pages later in the transcript, plaintiff's attorney asks plaintiff:

"Q. Okay. Was there anything that permitted whatever was in the air up above where the welders were working or where those stubs were laying—you mentioned some of the stubs got down. Anything that prevented that air from coming—or if there was something in the air that was going to be settling out from coming down to the second floor?

A. No.

Q. Was it that way throughout the time you were there?

A. Yes.

Q. Was Portable Elevator a clean place or a dirty place, Chuck?

A. I would classify it as a dirty place."

Plaintiff never testified, however, that the dirt was asbestos dust, and we are aware of no evidence that it was. He never testified to seeing clouds of dust in the workplace. *Cf. Thacker*,

151 Ill. 2d at 351 ("Various \*\*\* employees, including the decedent, testified that dust [from the sacks of raw asbestos] was continuously visible in the air of the plant when viewed in bright light."). It is true that, when ruling on a motion for judgment notwithstanding the verdict, a court should look at the evidence in the light most favorable to the opposing party, but that does not mean the court may fill the gaps in the opposing party's case with speculation. *Presbrey v. Gillette Co.*, 105 Ill. App. 3d 1082, 1094 (1982) ("[C]onjecture, guesswork, or suspicion is insufficient.").

¶ 83　　　　Once it is granted that defendant's welding rods, when rubbed together or stepped on, released respirable asbestos fibers, it would be a reasonable inference, rather than speculation, that plaintiff breathed *some* of the fibers, given that the fibers are microscopic and threadlike and, one might expect, would be wafted along on every draft of air (and here we are looking at the evidence in the light most favorable to plaintiff, as we must do (see *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999))). But plaintiff had to prove he inhaled enough asbestos fibers from the welding rods that the welding rods were "a material element and a substantial factor in bringing \*\*\* about" his mesothelioma. *Thacker*, 151 Ill. 2d at 354-55. "Conduct is a material element and a substantial factor if, absent the conduct, the injury would not have occurred." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 226 (2010). Plaintiff never presented any evidence that, but for the asbestos he breathed during his eight-month employment at Portable Elevator, he would not have contracted mesothelioma from the 40 years he spent as a car mechanic working on asbestos-containing brake lines. He never presented any evidence that the asbestos he breathed at Portable Elevator was more than minimal. Defendant's attorney asked Frank:

"Q. [C]an you give me any kind of quantification levels, numbers of fibers, or anything about [plaintiff] and any alleged exposure to welding rods?

A. No."

For all that appears in the record, the amount of asbestos fibers released from defendant's welding rods by rubbing them together or stepping on them was no more than the amount one would have encountered in a natural environment. Without any idea of the concentration of airborne asbestos fibers the welding rods would have produced, it would be conjectural to say the welding rods were a substantial factor in causing plaintiff's mesothelioma. Therefore, we also hold that the lack of any evidence of substantial causation likewise entitled defendant to a judgment notwithstanding the verdict.

¶ 84                                     III. CONCLUSION

¶ 85            For the foregoing reasons, we reverse the trial court's judgment.

¶ 86            Reversed.