**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

JANET SCHOEPKE, as Special )
Administrator of the Estate of EUGENE )
SCHOEPKE on behalf of the Estate of )
EUGENE SCHOEPKE, et al., )
                                          )
      Plaintiffs, )
                                          )
          v. )      Case No. N23C-09-059 ASB
                                          )
E.I. DU PONT DE NEMOURS AND )
COMPANY, et al., )
                                          )
      Defendants. )

Submitted: November 14, 2025
Decided: February 27, 2026

*Upon Defendants' Motion for Judgment as a Matter of Law Under Rule 50(b), or, in the Alternative, for a New Trial,* **DENIED.**

*Upon Plaintiffs' Motion to Alter or Amend Judgment to Include Pre-Judgment Interest,* **GRANTED.**

**ORDER**

Defendants have filed a "Motion for Judgment as a Matter of Law Under Rule 50(b), or, in the Alternative, for a New Trial;" Plaintiffs oppose the motion. Plaintiffs, for their part, have filed a "Motion to Alter or Amend Judgment to Include Pre-Judgment Interest," which Defendants oppose. After briefing closed, the Court heard oral argument from the parties. For the reasons set forth below, Defendants' "Motion for Judgment as a Matter of Law Under Rule 50(b), or, in the Alternative, for a New Trial" is **DENIED**, and Plaintiffs "Motion to Alter or Amend Judgment to Include Pre-Judgment Interest" is **GRANTED**.

## BACKGROUND

On September 3, 2023, Plaintiffs filed their complaint in this Court alleging Defendants, E.I. Du Pont Nemours & Company ("DuPont") and Sporting Goods Properties, Inc., individually and as successor-in-interest to Remington Arms Company ("Remington") (together, "Defendants"), alleging that the Defendants' negligence caused Eugene Schoepke's death.[1] Prior to trial, the parties each moved to exclude expert testimony proffered by their adversary.[2] In addition to substantial written briefing, over two days in November 2024, the parties presented evidence and argument in support of their positions.[3] The Court denied the parties' motions,[4] and the case moved to trial.

Trial commenced on July 8, 2025, and concluded on July 23, 2025.[5] The evidence established that Eugene Schoepke died on March 27, 2022, at the age of 84[6] following his February 22, 2022, mesothelioma diagnosis.[7] The parties did not dispute Mr. Schoepke's mesothelioma diagnosis or that exposure to asbestos can

---

[1] D.I. 1; D.I. 251.

[2] D.I. 43, 47, 94, 95, 168, 183, 192.

[3] D.I. 194, 195.

[4] D.I. 246.

[5] D.I. 341.

[6] Trial Tr., 07/22/25 at 12:18-10, 13:8.

[7] Trial Tr., 07/16/25 at 260:13-15.

cause that disease.[8]  Rather, the evidence and argument at trial focused on whether one, the other, or both Defendants were a "legal cause" and "cause in fact" of Mr. Schoepke's illness.[9]  The parties disputed whether Mr. Schoepke's use of asbestos-containing Remington shotgun shells exposed him to respirable asbestos and, ultimately, caused his death.[10]  Further, the parties disputed whether the Defendants knew, or should have known, of the dangers that the asbestos-containing shotgun shells created for consumers.[11]  This dispute persists and forms the basis of Defendants' motion.

On July 19, 2025, prior to submission of the case to the jury, Defendants filed a "Motion for Judgment as a Matter of Law on the Issue of Causation."[12]  Defendants argued that Plaintiffs presented insufficient evidence for a jury to reasonably find that Defendants' conduct was a cause of Eugene Schoepke's injury.[13]  Plaintiffs responded,[14] and on July 21, 2025, the Court denied the motion.[15]  On July 22, 2025,

---

[8] Trial Tr., 07/09/25 at 68:17-21.

[9] *See id.* at 8:9-10, 68:22-69:4.

[10] *Id.* at 68:22-69:4.

[11] *See e.g.,* Trial Tr., 07/22/25, at 110:2-13.

[12] D.I. 335.

[13] *Id.* at 1.

[14] D.I. 337.

[15] Trial Tr., 07/21/25 at 263:3-71:13.

after closing arguments and instructions, the jury received the case and began its deliberations.

While the jury deliberated, Defendants presented an oral motion for judgment as a matter of law "on six separate issues."[16] Defendants asserted: (1) "Plaintiff has not established that either of the defendants' conduct was the legal cause of Mr. Schoepke's injuries;"[17] (2) "Dr. Compton's fiber release study results do not show more than *de minimis* potential exposure [which] is required to prove causation under Illinois law;"[18] (3) "Plaintiff has no evidence of exposure to asbestos from gun cleaning;"[19] (4) "Plaintiff has no evidence that Mr. Schoepke was more susceptible to developing mesothelioma than the average person, including no evidence of genetic testing;"[20] (5) "Plaintiff has no evidence to support a finding of punitive damages as to either defendant;"[21] and (6) "Plaintiff has offered no evidence to prove liability as to DuPont."[22] Plaintiffs opposed the motion "on all grounds."[23] The Court did not immediately rule on the motion; rather, citing to Superior Court Civil

---

[16] Trial Tr., 07/22/25 (afternoon) at 4:12-14.

[17] *Id.* at 4:15-17.

[18] *Id.* at 6:13-18.

[19] *Id.* at 7:23-8:3.

[20] *Id.* at 8:5-10.

[21] *Id.* at 8:11-14.

[22] *Id.* at 9:8-11.

[23] *Id.* at 11:12-13.

4

Rule 50(b) the Court directed the parties to submit their position in writing in the event a judgment was returned in Plaintiffs' favor.[24]

On July 23, 2025, the jury returned its verdict, finding:

- Eugene Schoepke's mesothelioma was caused by exposure to asbestos,[25]

- Eugene Schoepke was exposed to asbestos from his use of a Defendant's shotgun shells,[26]

- Eugene Schoepke's exposure to asbestos from his use of a Defendant's shotgun shells was a proximate cause of his mesothelioma,[27]

- Remington was negligent and 40% responsible for proximately causing Eugene Schoepke's injury,[28]

- DuPont was negligent and 60% responsible for proximately causing Eugene Schoepke's injury,[29]

- Damages in favor of plaintiffs totaling $9,000,000.[30]

The jury did not find clear and convincing evidence that the conduct of Remington or DuPont constituted willful and wanton disregard for the rights or safety of Eugene Schoepke.[31]

---

[24] *Id.* at 12:1-19.

[25] D.I. 340; Trial Tr., 07/23/25 at 10:16-19.

[26] D.I. 340; Trial Tr., 07/23/25 at 10:20-23.

[27] D.I. 340; Trial Tr., 07/23/25 at 11:1-5.

[28] D.I. 340; Trial Tr., 07/23/25 at 11:6-9, 11:14-20.

[29] D.I. 340; Trial Tr., 07/23/25 at 11:10-13, 11:14-22.

[30] D.I. 340; Trial Tr., 07/23/25 at 11:23-12:7.

[31] D.I. 340; Trial Tr., 07/23/25 at 12:8-13.

After entry of the judgment, Plaintiffs filed a "Motion to Alter or Amend Judgment to Include Pre-Judgment Interest,"[32] and a "Motion for Costs."[33] Defendants filed a "Motion for Judgment as a Matter of Law under Rule 50(b) or, in the Alternative, for a New Trial,"[34] and a "Motion to Stay Execution of Judgment Pending Disposition of Post-Trial Motion."[35] The Court heard oral argument and took the motions under advisement.[36] The parties informed the Court that the "Motion to Stay" was withdrawn and the "Motion for Costs" was resolved.[37] This Order addresses the remaining motions. The parties agree that Delaware procedural law and Illinois substantive law guide the Court's assessment of the matters before it.

[32] D.I. 348 ("Motion for Pre-judgment Interest").
[33] D.I. 350.
[34] D.I. 352 ("Def. Mot.").
[35] D.I. 353.
[36] D.I. 385.
[37] D.I. 385, 388.

## DISCUSSION

### I. DEFENDANTS' JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL

#### A. LEGAL STANDARDS

Defendants have moved for judgment as a matter of law and, alternatively, for a new trial. Superior Court Civil Rule 50(b) provides:

> Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the Court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and filing not later than 10 days after entry of judgment. A motion for a new trial under Rule 59 may be joined with a renewal of the motion for judgment as a matter of law, or a new trial may be requested in the alternative. If a verdict was returned, the Court may, in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law. If no verdict was returned, the Court may, in disposing of the renewed motion, direct the entry of judgment as a matter of law or may order a new trial.[38]

And, Superior Court Civil Rule 59 provides, "[a] new trial may be granted as to all or any of the parties and on all or part of the issues in an action in which there has been a trial for any of the reasons for which new trials have heretofore been granted in the Superior Court."[39] This Court's rules permit these motions to be presented together; however, two separate standards apply.

---

[38] Super. Ct. Civ. R. 50(b).

[39] Super. Ct. Civ. R. 59(a).

In deciding a motion for judgment as a matter of law, the Delaware Supreme Court instructs:

> Judgment as a matter of law is appropriate if there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party. When considering a motion for judgment as a matter of law, the Court must view the evidence and draw all reasonable inferences in a light most favorable to the non-moving party. The moving party bears the burden of demonstrating both the absence of a material fact and entitlement to judgment as a matter of law.[40]

"When considering a motion for a new trial, the Superior Court must give enormous deference to the jury's verdict, and should not set aside the jury's verdict unless a reasonable jury could not have reached the result."[41] The moving party "must show the need to correct clear error of law or to prevent manifest injustice."[42] "Historically, this State's courts have exercised their power to grant a new trial with caution and extreme deference to the findings of a jury. A court will not set aside a jury's verdict unless the evidence preponderates so heavily against the jury verdict that a reasonable jury could not have reached the result."[43]

---

[40] *LCT Capital, LLC v. NGL Energy Partners LP,* 249 A.3d 77, 89-90 (Del. 2021) (cleaned up) (internal citations omitted).

[41] *Id.* at 90 (cleaned up) (internal citations omitted).

[42] *Conduent State Healthcare, LLC v. AIG Specialty Insurance Co.*, 2023 WL 2256052, at *1 (Del. Super. Ct. Feb. 14, 2023) (cleaned up) (quoting *Monzo v. Nationwide Prop. & Cas. Ins. Co.*, 2020 WL 2467074, at *2 (Del. Super. Ct. May 13, 2020)).

[43] *Amalfitano v. Baker*, 794 A.2d 575, 577 (Del. 2001) (cleaned up) (quoting *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979).

**B. ANALYSIS**

Defendants contend that the Court should grant judgment as a matter of law because Plaintiff "failed to meet her burden of proving that either Defendant's conduct was the legal cause of Mr. Schoepke's injury,"[44] "failed to prove that Defendants' conduct was the 'cause in fact' of Mr. Schoepke's injury,"[45] and "failed to meet her burden of proof as to a basis for DuPont's liability for Remmington shells."[46] Defendants alternatively assert that a new trial should be granted because Plaintiff improperly invited the jury to speculate,[47] inappropriately elicited additional exposure testimony,[48] and invited the jury to "impose liability for failure to recall though Defendants had no duty."[49] Plaintiffs respond that they presented sufficient evidence as to both "legal cause" and "cause in fact,"[50] and "presented evidence sufficient to hold DuPont liable."[51] Plaintiffs further contend Defendant's motion for a new trial lacks merit.[52]

---

[44] Def. Mot. at 5.

[45] *Id.* at 11.

[46] *Id.* at 22.

[47] *Id.* at 25.

[48] *Id.* at 28.

[49] *Id.* at 29.

[50] D.I. 374 ("Pl. Resp.") at 3-18.

[51] *Id.* at 18.

[52] *Id.* at 27.

## 1. JUDGMENT AS A MATTER OF LAW

In an asbestos products liability case such as this, a necessary element of proof "is that the defendant's asbestos was a 'cause' of the decedent's injuries."[53] "[C]ausation requires proof of both 'cause in fact' and 'legal cause.'"[54] Defendants challenge the jury's findings on both aspects of causation.

### a. Legal Cause

Under Illinois law, in a failure to warn case, a plaintiff must prove that "knowledge existed in the industry of the dangerous propensity of *the manufacturer's product.*"[55] The Illinois Supreme Court, in *Woodill v. Parke Davis & Co.,*[56] explained that for liability to attach, a plaintiff must prove that "the defendant manufacturer *knew or should have known* of the danger that caused the injury."[57] The question for the Court, then, is whether Defendants knew or should have known of the danger posed by their asbestos-containing shotgun shells.

Defendants argue that "Illinois law required that Plaintiff come forward with specific evidence that knowledge that Remington's shotgun shells—containing an

---

[53] *Thacker v. UNR Industries, Inc.*, 603 N.E.2d 449, 455 (Ill. 1992).

[54] *Id.*

[55] *McKinney v. Hobart Brothers Co.,* 127 N.E.3d 176, 187 (Ill. App. 2018) (quoting *Woodill v. Parke Davis & Co.,* 402 N.E.2d 194, 198 (Ill. 1980)).

[56] 402 N.E.2d 194 (Ill. 1980).

[57] *Id.* at 198 (emphasis added).

encapsulated component—could release asbestos fibers sufficient to pose a risk of mesothelioma to hunters like Mr. Schoepke was available in the scientific community during the timeframe in which Remington manufactured and sold the shells."[58] They contend that "there is a 'crucial distinction' between knowledge that raw asbestos fibers could cause mesothelioma and knowing that encapsulated asbestos fibers in the defendant's product posed a risk of disease."[59]

Plaintiffs respond that they presented "ample evidence that both Defendants knew about the hazards of asbestos dust and knew that the shotgun shells created dust when used as intended."[60] Thus, they contend that there was sufficient evidence establishing Defendants' duty to warn.[61]

As is often the case, the parties' arguments drive the positions to the poles, when the answer lies somewhere in between. A manufacturer has a duty to warn of known dangers and dangers of which it should be aware.[62] And, of course, encapsulation of an asbestos containing product is not "irrelevant."[63] Viewing the record, and all reasonable inferences that may be drawn from the record, in the light

---

[58] Def. Mot. at 7.

[59] D.I. 352 at 7 (citing *McKinney*, 127 N.E.3d at 190).

[60] Pl. Resp. at 9.

[61] *Id.*

[62] *McLaughlin v. Dover Downs, Inc.*, 2008 WL 2493392, at \*14 (Del. Super. Ct. July 17, 2008) (citations omitted).

[63] Pl. Resp. at 8.

most favorable to the plaintiffs, the Court concludes that plaintiffs presented sufficient evidence to find, as a matter of law, that Defendants knew, or should have known, that its inclusion of asbestos within the basewad of a shotgun shell presented a risk to consumers.

In *McKinney v. Hobart Brothers Company*,[64] the Illinois Appellate Court found that a manufacturer's liability hinged on "whether [at the time the product was manufactured] 'knowledge existed in the industry of the dangerous propensity of the *manufacturer's product* – which, in this case, was not raw asbestos but defendant's welding rods, in which asbestos was encapsulated."[65] In the early 1960s, when the welding rods were manufactured, the dangers of raw asbestos were known in the industry.[66] But the trial record offered "no evidence of contemporaneous knowledge in the industry that welding rods with asbestos encapsulated in the flux were hazardous."[67] The *McKinney* court concluded:

> [I]n 1962 and 1963, defendant could not have owed plaintiff a duty to warn plaintiff of a hazard that, at that time, was unknown to the industry to which defendant belonged, namely, the ability of its welding rods to release encapsulated asbestos fibers if the welding rods were simply rubbed together or stepped on.[68]

---

[64] 127 N.E.3d 176 (Ill. App. 2018).

[65] *Id.* at 188. (citing *Woodill*, 402 N.E.2d at 198).

[66] *Id.* at 190.

[67] *Id.* (citing *Gideon v. Johns-Manville Sales Corp.,* 761 F.2d 1129, 1145 (5th Cir. 1985)).

[68] *Id.* at 190.

Defendants posit that *McKinney* controls and, thus, the jury's verdict here must not stand.[69]  At trial, Defendant's elicited state-of-the-art expert testimony as it pertained to asbestos-containing shotgun shells in the 1960s to 1980s.[70]  The evidence, Defendants claim, revealed:

> (1) that there was no scientific article or study suggesting an asbestos-related health risk to hunters in the relevant time period; and, more broadly, (2) that scientific literature published in the relevant time period considered products containing asbestos fibers "bound with some sort of binder" to pose an insignificant risk of asbestos exposure.[71]

Much like the encapsulated asbestos welding rods considered in *McKinney*, plaintiffs offered no state-of-the-art evidence revealing the hazards of embedding asbestos within a shotgun shell.

Plaintiffs contend that "Illinois Courts have increasingly distanced from the standards in *McKinney* by both clarifying and distinguishing *McKinney* over the years."[72]  Plaintiffs cite to *Daniels v. ArvinMeritor*[73] and *Johnson v. Edward Orton Jr. Ceramic Fund*,[74] as examples of this distancing.[75]  Defendants assert that these

---

[69] Def. Mot. at 6.

[70] Trial Tr., 07/15/25, at 7:5-8, 20:13-21.

[71] D.I. 376 ("Def. Reply") at 1.

[72] *Id.* at 4.

[73] 146 N.E. 3d 655 (Ill. App. 2019)

[74] 71 F.4th 601 (2023).

[75] Pl. Resp. at 5-7.

13

cases merely reflect the application of the principles set forth in *McKinney*.[76] While this may be so, the Illinois Courts' application of the principles announced in *McKinney* assist this Court in resolving the motion.

In *Daniels*, the Illinois Appellate Court "considered *McKinney* and *Woodill*" and concluded that "state of the art evidence is not wholly necessary where there is evidence that the defendant knew or should have known that the injury may occur if no warning is provided."[77] In *Daniels*, plaintiffs established that defendant "was aware that end users used paint scrapers, wire brushes, and cutters to fit the gaskets and remove packaging."[78] Testimony established that defendant "was aware of the dangers of asbestos dust and that pipefitters manipulated John Crane's encapsulated asbestos in a manner that produced dust."[79] Here, too, the evidence established that Defendants were aware of the dangers of asbestos when it included the substance in its shotgun shells and were aware that the firing of the asbestos-containing product produced dust.

In *Johnson*, the Seventh Circuit Court of Appeals commented that in *McKinney* "the animating policy concern is to ensure that where the product

---

[76] Def. Reply at n. 1.

[77] *Daniels,* 146 N.E. 3d at 676.

[78] *Id.* at 677

[79] *Id.* (cleaned up).

14

possesses dangerous propensities and there is unequal knowledge with respect to the risk of harm, the manufacturer, possessed of such knowledge, must warn of the danger."[80] Further, "what a manufacturer knew of should have known is determined by the present state of human knowledge at the time."[81] The defendant packaged and delivered its product in vermiculite contaminated with asbestos.[82] The Court found "Orton should be held to an expert standard of knowledge with respect to the packaging that it used to ship its pyrometric cones and to which it exposed consumers such as Mr. Johnson."[83] Liability was imposed because "it was possible, based on the present state of human knowledge, for Orton to know that the W.R. Grace vermiculite was contaminated with asbestos."[84] "Orton should have known of the contamination."[85]

The Court has dedicated considerable time to evaluating the distinctions between the cases cited by the parties. Of course, it is not difficult to assess what is known within an industry at a particular time. There is no dispute here that, as early as 1960, it was known that "raw" asbestos posed a danger to consumers. The

---

[80] *Johnson*, 71 F.4th at 614 (cleaned up) (quoting *Sollami v. Eaton*, 772 N.E.2d 215, 219 (Ill. 2002)).

[81] *Id.* (internal citations omitted).

[82] *Id*. at 606.

[83] *Id.* at 615.

[84] *Id.*

[85] *Id.*

challenge, of course, is determining what a manufacturer *should have known.* The Court concludes that, under Illinois law, this is an intensely fact-specific question. An application of the principles set forth in the cited cases applying Illinois law supports the conclusion that Defendants should have known of the danger of their asbestos-containing product.

First, it is important to understand the composition and dynamics of the Remington shotgun shell. To formulate a basewad, a quantity of asbestos was mixed with other materials and bound together by subjecting the mixture to intense pressure.[86] This bonding encapsulated the asbestos, creating a product that is "distinctly different from . . . friable products in that you can't crush it by hand."[87] That encapsulated product is then subjected to a controlled explosion when fired from a shotgun.[88] When the shotgun's trigger is pulled, the firing pin "hits the bottom of the shotgun shell [and] ignites the gunpowder below" causing the gunpowder to explode.[89] The basewad prevents the shell from exploding; "it forces the explosion up and out of the shell. And when that happens, you're shooting particulates and gases out of the nozzle of that gun and out of the chamber on the

---

[86] Trial Tr., 07/15/25 at 31:8-13.

[87] *Id.* at 31:15-17.

[88] *Id.* at 34:2-7.

[89] *Id.* at 34:9-17.

side of the gun over a thousand feet per minute."[90]  The asbestos basewad was manufactured to sit in the midst of this explosion to ensure projectiles were forced down the barrel of the firearm at near supersonic speed.[91]  While a manufacturer might not recognize that asbestos could be released from dropping or stepping on a an asbestos-encapsulated welding rod, it is not surprising that this designed explosion released asbestos to be breathed by a shooter.

At the time the asbestos-containing shotgun shells were manufactured, the danger of airborne asbestos fibers was well understood.  While Defendant's might not have known that their shells could release asbestos, they *should have known*.[92] The trial record established that Defendants were the only ammunition manufacturer to include asbestos within its basewads.[93]  It is, therefore, unsurprising that there was no data demonstrating the safety – or danger – of this manufacturing decision.  But the Court does not read the Illinois cases on legal causation to allow a Defendant to disregard readily foreseeable risks.  Because Defendants have failed to meet their burden by "show[ing] that there is no competent evidence upon which

---

[90] *Id.* at 34:23-35:5.

[91] *Id.* at 34:18-35:6.

[92] *Woodill,* 402 N.E.2d at 198.

[93] Trial Tr., 07/18/25, 61:4-8.

17

the verdict could reasonably be based,"[94] their motion for a new trial on the basis of "legal causation" is **DENIED**.

### b. Cause in Fact

Defendants next argue that Plaintiff failed to produce evidence establishing the frequency, regularity, and proximity of Mr. Schoepke's exposure to asbestos released from their shotgun shells.[95] They assert:

> Plaintiff only presented evidence that the shotgun shells were *capable* of releasing asbestos fibers, without the requisite evidence that the shells in fact released respirable fibers under circumstances such that they would be "actually inhaled" by Mr. Schoepke outdoors, or that any fibers potentially inhaled by Mr. Schoepke were any more than *de minimis*.[96]

In response, Plaintiffs contend that the evidence adduced at trial satisfies the "'frequency, regularity, and proximity' test which was adopted by the Illinois Supreme Court in *Thacker v. UNR Industries, Inc.*"[97] They argue,

> the jury heard evidence that the normal and foreseeable use of Defendants' asbestos-containing shotgun shells causes respirable asbestos fibers to be released, which fibers are released directly into the breathing zones of shooters, in concentrations that are orders of magnitude greater than what the shooters would have otherwise been exposed to.[98]

---

[94] *Broughton v. Wong*, 2018 WL 1867185, at *6 (Del. Super. Ct. Feb. 15, 2018).

[95] Def. Mot. at 13.

[96] *Id.* at 12-13.

[97] Pl. Resp. at 9.

[98] *Id.* at 17.

The parties' written arguments[99] mirror those made during trial, which the Court denied.[100] Nothing in the most recent briefing or argument compels the Court to reach a different result; thus, the Court now reduces to writing the decision it issued on the record at trial.

Plaintiffs chose to prove "cause in fact" under the "substantial factor" test. In *Thacker v. UNR Industries, Inc.*, the Illinois Supreme Court "rejected the argument … that so long as there is *any* evidence that the injured [party] was exposed to a defendant's asbestos-containing product, there is sufficient evidence of cause in fact to allow the issue of legal causation to go to the jury."[101] Instead, the Illinois Supreme Court adopted the "'frequency, regularity and proximity' test as a means by which an asbestos plaintiff can prove more than minimum contact to establish that a specific defendant's product was a substantial factor in being a cause in fact of a plaintiff's injury."[102]

Under the *Thacker* test, Plaintiffs must show that Mr. Schoepke was exposed to Defendants' asbestos through proof that (1) he was regularly in an area where the Defendants' asbestos was presented and (2) he was, in fact, sufficiently close to this

---

[99] D.I. 335, 337.

[100] Trial Tr., 07/21/25 at 263:3-71:13.

[101] *Nolan v. Weil-McLain*, 910 N.E.2d 549, 559 (Ill. 2009).

[102] *Id.* at 558 (citing *Thacker*, 603 N.E.2d 449).

area so as to come into contact with the Defendants' product.[103] Under the frequency, regularity, and proximity test, Illinois law does not require a plaintiff to prove "the exact quantity of asbestos fibers a decedent was exposed to."[104]

Defendants cite to *Krumwiede v. Tremco, Inc.*,[105] a case decided by the Appellate Court of Illinois, and a case in which Dr. Frank also testified, in support of their position. In *Krumwiede*, "Dr. Frank offered almost no testimony or opinions regarding decedent's exposure to asbestos fibers from [the Defendant's] products."[106] Instead, relying on his own experience, Dr. Frank testified that "similar products 'can' release fibers under some unknown set of circumstances and in some unknown quantity or concentration."[107] And, as the Appellate Court of Illinois put it, "noticeably absent from his testimony was any opinion that exposure to asbestos from [Defendant's] products was a 'substantial' factor in decedent's development of his disease."[108]

---

[103] *Thacker*, 603 N.3.2d at 457.

[104] *Zickuhr v. Ericsson, Inc.*, 962 N.E.2d 974, 987 (Ill. App. Ct. 2011).

[105] 148 N.E.3d 764 (Ill. App. Ct. 2020).

[106] *Krumwiede v. Tremco, Inc.*, 148 N.E.3d 764, 785 (Ill. App. Ct. 2020).

[107] *Id.*

[108] *Id.*

Such is not the case here. First, Dr. Frank relied on Dr. Compton's work to establish that Mr. Schoepke was exposed to asbestos.[109] He testified, based on his review of Dr. Compton's study, that "the levels from the shotgun shells are many, several orders of magnitude greater than background. They were short-term, intermittent high-level exposures."[110] Unlike *Krumwiede*, here Dr. Frank's opinion was not based on his experience that certain products "can" release asbestos fibers but grounded on the release of fibers revealed through Dr. Compton's experiment.

Second, Dr. Frank opined that Mr. Schoepke's exposure to asbestos from Defendants' shotgun shells was "the substantial factor in giving [Mr. Schoepke] th[e] disease, which caused his death."[111] He did not, as Illinois law cautions against, solely opine that every exposure to asbestos was the substantial causative factor in Mr. Schoepke's development of mesothelioma. And so, neither of the *Krumwiede* Court's concerns—concerns that necessitated judgment as a matter of law in favor of those defendants—are present here.

Dr. Frank further based his "substantial factor" opinion on his understanding of the frequency and regularity of Mr. Schoepke's shooting. To do so, he reviewed the depositions of Mr. Schoepke's family members and concluded that Mr. Schoepke

---

[109] Trial Tr., 07/14/25 (afternoon) at 7:18-8:18.

[110] *Id.* at 54:13-16.

[111] *Id.* at 15:12-14.

21

was "an avid hunter."[112]  Dr. Frank understood that "at least 8 times a year [Mr. Schoepke] would go out and hunt," he "regularly used shotguns," and that "depending on what [Mr. Schoepke] was hunting … he might go through 8 or 10 shells, or he might go through a box or two, which would be 25 in a box."[113] Testimony also established that Mr. Schoepke would, for lack of a better term, target shoot using field load shotgun shells.[114]

Viewing the evidence, and all reasonable inferences that may be drawn from the evidence, in the light most favorable to the Plaintiffs, the Court finds there exists a legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiffs.[115] Defendant's motion for judgment as a matter of law on the issue of "cause in fact" is **DENIED**.

### c. *DuPont Liability Established*

Defendants next contend that "Plaintiff failed to introduce any evidence to impose liability on DuPont for a product designed, manufactured, and sold by Remington."[116]  Plaintiffs respond that Defendants waived any challenge to

---

[112] *Id.* at 13:5-12.

[113] *Id.* at 13:12-14:2.

[114] *Id.* at 14:3-8.

[115] *See LCT Capital, LLC,* 249 A.3d at 88-90.

[116] Def. Mot. at 22.

DuPont's individual liability,[117] and in any event, sufficient evidence was offered supporting the jury's finding of liability for both DuPont and Remington.[118]

Defendants, citing *Jones v. McCook Drum & Barrell Co.*,[119] assert that a "cause of action in products liability can only be directed against the manufacturer of the [product] or some party in the distributive chain[.]"[120]  More recently, the Illinois Supreme Court explained, "all manufacturers, wholesalers, and retailers in the chain of distribution play an integral role in the overall producing and marketing of the defective product, uniquely justifying the imposition of strict liability even if they do not have a hand in its development or manufacture."[121]

Here, the asbestos-containing shotgun shells used by Mr. Schoepke were marketed and sold with Remington and DuPont markings.[122]  In fact, the two companies were closely aligned in management and production.[123]  DuPont's Oval Trademark Product Seal of Approval was placed on, and remained on, the packaging

---

[117] Pl. Resp. at 18.

[118] *Id.* at 20.

[119] 595 N.E. 2d 670 (Ill. App. 1992).

[120] Def. Mot. at 22 (quoting *McCook Drum*, 595 N.E. 2d at 674).

[121] *Cassidy v. China Vitamins, LLC*, 120 N.E.3d 959, 968 (Ill. 2018) (cleaned up) (internal citations omitted).

[122] Trial Tr., 07/18/25, at 153: 3-6.

[123] Trial Tr., 07/21/25 at 38:6-20.

of Remington asbestos-containing shotgun shells.[124] That logo, with DuPont's permission, was located above the door at the Remington Bridgeport manufacturing plant.[125] DuPont engineer resource forces were stationed at the Bridgeport manufacturing plant.[126] The plastics and gunpowder used to make the Remington shells came from DuPont.[127] And a 1960 DuPont magazine advertised Remington shotgun shells.[128] The trial evidence revealed the operations of DuPont and Remington to be inextricably intertwined, and a reasonable basis existed for a jury to find DuPont was a manufacturer of the asbestos-containing shells.

Barbara Dawson testified as the corporate witness for DuPont, Remington, and SPGI.[129] She explained that DuPont acquired "a majority interest of [Remington] in 1933. But the Remington identification was much more prominent that the DuPont one on every package."[130] DuPont was founded in 1902 "as a manufacturer of black powder, gun powder explosives."[131] Remington was founded

---

[124] Trial Tr., 07/18/25, at 153:3-6.

[125] *Id.* at 77: 4-15, 149:16-19.

[126] Trial Tr., 07/18/25, at 77:16-18.

[127] Trial Tr., 07/21/25, at 60:16-21, 60:22-23.

[128] Trial Tr., 7/18/25, at 73:3-23.

[129] Trial Tr., 07/21/25 at 14:7-8.

[130] *Id.* at 32:10-13.

[131] *Id.* at 34:6-7.

fourteen years later,[132] and in 1933 DuPont acquired a controlling interest in Remington.[133] DuPont maintained a position of "management and control" of Remington through the 1980s.[134]

Viewing the evidence, and all reasonable inferences that may be drawn from the evidence, in the light most favorable to the Plaintiffs, the Court finds there exists a legally sufficient evidentiary basis for a reasonable jury to find, based on DuPont's "co-branding" the shotgun shells with its distinctive logo, its ongoing management and control of Remington, its advertising of the Remington shells in its annual magazine, and its display of the DuPont logo on the exterior of the manufacturing plant, DuPont liable, independent of Remington, for Mr. Schoepke's injury. Defendant's motion for judgment as a matter of law on the issue of DuPont's liability is **DENIED**.

### 2. NEW TRIAL

As an alternative to judgment as a matter of law, Defendants assert that a new trial should be granted because the Plaintiffs "invited the jury to speculate as to whether shotgun shell use caused Mr. Schoepke's mesothelioma,"[135] and "invited

---

[132] *Id.* at 34:20-22.

[133] *Id.* at 35:1-3.

[134] *Id.* at 38:6-20.

[135] Def. Mot. at 25.

the jury to impose liability for failure to recall though defendants had no duty."[136] Plaintiffs contend these arguments lack merit.[137]

"Every analysis of a motion for a new trial must begin with the presumption that the jury verdict is correct."[138] The jury verdict is entitled to "enormous deference," and should only be set aside if: the verdict "contradicts the great weight of the evidence," "the jury disregarded the applicable rules of law," or "the jury's verdict is tainted by legal error committed by the trial court before or during the trial."[139] Defendants' contentions do not support granting a new trial.

### a. *Measurement of Asbestos Released by Shotgun Shells*

Defendants challenge the methodology employed by Plaintiff to detect asbestos fibers in the air following shotgun discharge.[140] Defendants contend "the AHERA/ISO-sized structures Plaintiff repeatedly referenced during trial are not probative of the critical medical causation issue in this case."[141] But Dr. Compton

---

[136] *Id.* at 29.

[137] Pl. Resp. at 27, 29.

[138] *Envolve Pharmacy Solutions, Inc. v. Rite Aid Hdqtrs. Corp.,* 2023 WL 5604201, at *10 (Del. Super. Ct. Aug. 30, 2023) (internal citations omitted).

[139] *Id.* at *9 (internal citations omitted).

[140] Def. Mot. at 25-28.

[141] Def. Mot. at 28.

explained that the OSHA method proposed by the Defendants detects "only the tip of the iceberg."[142]  Further, he explained:

> [T]he AHERA method is designed to use TEM to evaluate the presence of asbestos in air. . . . It provides a useful tool to look at an air sample and somewhat rapidly determine wither or not there are any asbestos fibers there but at a level that's higher magnification than PCM.

> [W]ith PCM, you are counting only those fibers that are longer than five micrometers, but with TEM and the AHERA method, you are counting anything that's longer than 0.5 micrometers in length.  So it's a more total count in that respect. . . .[143]

And the fibers detected through Plaintiff's methodology are "probative of the critical medical causation issue in this case;"[144] Dr. Frank testified that short fibers, not visible under a light microscope, "are capable of producing disease."[145]

To be sure, the parties disagreed on the methodology used by each to measure airborne asbestos fibers generated by the firing of Defendants' asbestos-containing shotgun shells.  Plaintiffs posited that Defendants employed a methodology which underreported extant fibers and structures, while Defendants asserted Plaintiff's methodology generated results "untethered to any medical causation opinion."[146] But each party was afforded the opportunity to advance their respective theory

---

[142] Trial Tr., 07/10/25 (morning) at 88:18-19.

[143] *Id.* at 85:17-86:5.

[144] Def. Mot. at 28.

[145] Trial Tr., 07/14/25 (morning) at 82:3-4.

[146] Def. Mot. at 25.

within the bounds of the law and each proffered relevant expert testimony to explain the science behind the testing they performed.

### b. Shotgun Cleaning

Defendants also contend that, by eliciting evidence of Mr. Schoepke's gun cleaning, Plaintiff "invited the jury to speculate that Mr. Schoepke was exposed to asbestos from gun cleaning."[147] The Court allowed this evidence "to the extent that there are personal observations they can testify to."[148] But the Court also clarified with counsel that the evidence was of limited relevance and confirmed that there would not be "any argument that somehow gun cleaning has any impact on this particular individual's development of mesothelioma."[149]

The Court does not find Plaintiff's evidence of Mr. Schoepke's gun cleaning warrants a new trial. To the extent the Court erred in admitting this evidence, Rule 61 squarely applies:

> No error in either the admission or exclusion of evidence and no error or defect in any ruling or order in anything done or omitted by the Court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take action appears to the Court inconsistent with substantial justice.[150]

---

[147] *Id.* at 28.

[148] Trial Tr., 07/16/25 at 274:17-18.

[149] *Id.* at 274:23-275:3.

[150] Super. Ct. Civ. R. 61.

The Court finds Defendants suffered no prejudice from the admission of gun cleaning evidence. The evidence, if improperly admitted, was harmless.[151]

### c. "Recall"

Defendants contend Plaintiff's argument that Defendant's failed to "recall" the shotgun shells "improperly invited the jury to impose liability on Defendants for failing to recall the shotgun shells when there was no legal duty to do so (an essential prerequisite for negligence liability)."[152] Plaintiff responds that "recall" evidence was properly offered to the jury and, to the extent it presented confusion, the Court's limiting instruction properly guided the jury's use of the evidence.[153]

Defendants' objected throughout trial to Plaintiff's use of the word "recall" as that word invokes a "regulatory process initiated by the CPSC" and "[t]here is no such thing as a voluntary recall."[154] Recognizing the word "recall" has an industry-specific meaning, and a more general meaning, the Court invited counsel to prepare an instruction to properly guide the jury if the term was mentioned during trial.[155]

---

[151] *See Cohen-Thomas v. Lewullis*, 2016 WL 721009, at *4 (Del. Super. Ct. Jan. 29, 2016).

[152] Def. Mot. at 29.

[153] Pl. Resp. at 32.

[154] Trial Tr., 07/16/25 at 270:9-10.

[155] Def. Mot., Ex. M; *see* Trial Tr., 07/16/25 at 271.

Each party provided the Court with a draft limiting instruction.[156] From these submissions, and based on extant law, the Court crafted an instruction informing the jury that: "Under the law applicable to this case, there is no duty to recall a product unless a statute or regulation requires the product to be recalled. In the absence of a statutory or regulatory requirement, the term 'recall' must be assigned its commonly understood meaning, 'to call back.'"[157]

"A party is not entitled to a particular jury instruction but does have the unqualified right to have the jury instructed on a correct statement of the substance of the law."[158] To the extent Plaintiff may have sought to inject a duty upon Defendants beyond that required by law, the Court's instruction informed the jury that, in the absence of a statute or regulation, Defendants owed no such duty. A new trial is not warranted.

## II. PREJUDGMENT INTEREST

Following the jury verdict, the Court entered judgment in favor of Plaintiffs for $9,000,000.[159] Plaintiffs then filed a "Motion to Alter or Amend Judgment to

---

[156] Def. Mot., Ex. M.

[157] Trial Tr., 07/22/25 (morning) at 135:7-12.

[158] *Express Scripts, Inc. v. Bracket Holdings Corp.,* 248 A.3d 824, 838 (Del. 2021) (cleaned up).

[159] D.I. 347

Include Pre-Judgment Interest."[160] Defendants oppose, arguing that Plaintiffs did not request interest in their first filed complaint and that interest is not allowed under Illinois law for survival actions.[161]

## A. LEGAL STANDARD

"The recovery of prejudgment interest in Delaware is a matter of substantive law."[162] And, the parties have agreed that Illinois substantive law applies.

Illinois law, 735 ILCS 5/2-1303(c), provides that "[i]n all actions brought to recover damages for personal injury or wrongful death . . . the plaintiff shall recover prejudgment interest on all damages, except punitive damages, sanctions, statutory attorney's fees, and statutory costs, set forth in the judgment."[163] Under Illinois law, "[p]rejudgment interest . . . begin[s] to accrue on the date the action is filed. If the plaintiff voluntarily dismisses the action and refiles, the accrual of prejudgment interest shall be tolled from the date the action is voluntarily dismissed to the date the action is refiled."[164] "[I]nterest is calculated at the rate of 6% per annum on the amount of the judgment, minus punitive damages, sanctions, statutory attorney's

---

[160] Motion for Prejudgment Interest.

[161] D.I. 377 ("Def. Resp.") at 1-2

[162] *Cooper v. Ross & Roberts, Inc.*, 505 A.2d 1305, 1307 (Del. Super. Ct. 1986).

[163] 735 ILCS 5/2-1303(c).

[164] *Id.*

fees, and statutory costs."[165]  Where the language of a statute is clear, as is the case with the Illinois' statute providing for prejudgment interest, Courts have an obligation to apply the statute.[166]

## B. ANALYSIS

Defendants argue that, because Plaintiffs did not request prejudgment interest in their original complaint, they are barred from seeking interest from the date of that filing under 735 ILCS 5/2-604.2.[167]  Subsection (a) of that statute provides, "[e]xcept in personal injury actions, every count in every complaint and counterclaim must request specific remedies the party believes it should receive from the court."[168]  But subsection (c) states "[e]xcept in the case of default, the remedies requested from the court do not limit the remedies available."[169]  "Putting these sections together suggests that the remedies requested in the complaint do not limit the remedies available when a case is adjudicated on the merits."[170]  It follows, under 5/2-604.2, that Plaintiffs failure to request prejudgment interest in their

---

[165] *Id.*

[166] *Cotton v. Coccaro*, 236 N.E.3d 517, 537 (Ill. App. Ct. 2023).

[167] Def. Resp. at 2.

[168] 735 ILCS 5/2-604.2(a).

[169] 735 ILCS 5/2-604.2(c).

[170] *See Schwartz v. Illinois Human Rights Commission*, 256 N.E.3d 431, 456 (Ill. App. Ct. 2024).

original complaint is not fatal, and "[p]rejudgment interest shall begin to accrue on the date the action is filed."[171]

Defendants next argue that Plaintiffs are not entitled to prejudgment interest for survival actions.[172] "The language of the statute is the best indication of legislative intent, and courts give that language its plain and ordinary meaning."[173] Under the ordinary meaning of 5/2-1303(c), the statute applies to personal injury actions.[174] Personal injury actions that survive the decedent are actions to recover damages, except actions to recover for slander and libel.[175] Plaintiffs survival action falls squarely within the class of actions subject to prejudgment interest.

Plaintiffs originally filed their complaint in Cook County Illinois on August 9, 2022.[176] Plaintiffs filed a complaint in the Delaware Superior Court on September 7, 2023,[177] and voluntarily dismissed the Illinois complaint on September 18,

---

[171] 735 ILCS 5/2-1303(c).

[172] Def. Resp. at 3.

[173] *Kroft v. Viper Trans, Inc.*, 263 N.E.3d 1245, 1268 (Ill. App. Ct. 2025) (citing *Mosby v. Ingalls Memorial Hospital*, 234 N.E.3d 110, 118 (Ill. 2023)).

[174] 735 ILCS 5/2-1303(c).

[175] 755 ILCS 5/27-6.

[176] Motion for Prejudgment Interest, Ex. A (The Motion for Prejudgment Interest states the Illinois complaint was filed on August 9, 2022. The attached Exhibit A shows the Complaint was filed on May 16, 2023. Plaintiffs attached a copy of the Revised Exhibit A showing the Original Complaint filed on August 9, 2022. *See* D.I. 387).

[177] D.I. 1.

2023.[178]  Because the Delaware complaint was filed before the dismissal of the Illinois case, interest is not tolled.[179]  And under 5/2-1303(c) interest begins to accrue at 6% per annum on the date of filing – August 9, 2022 – and runs through entry of judgment – August 1, 2025.[180]  Plaintiffs' "Motion to Alter or Amend Judgment to Include Pre-judgment Interest," is **GRANTED**.  The parties shall prepare a form of final order of judgment consistent with this decision.

---

[178] *Id.*, Ex. B.

[179] *See* 735 ILCS 5/2-1303(c).

[180] 735 Ill. Comp. Stat. Ann. 5/2-1303(c); Motion for Prejudgment Interest, Ex. A, B; D.I. 1, D.I. 347.

**CONCLUSION**

The parties vigorously litigated the novel issue of whether exposure to an asbestos-containing shotgun shell, through its firing, may serve as the cause for a shooter's mesothelioma. In the end, based on the facts presented, a jury of this Court found that it could and found Remington and DuPont liable for the shooter's – Mr. Schoepke's – injury and death. Defendants' request for additional review under Rule 50 is understandable. But, having reviewed the evidence and arguments, the Court finds the request must be denied. Similarly, to the extent Defendants wish to revisit certain rulings in their motion for a new trial, applying the lens of Rule 59, that too must fail. Finally, under Illinois law, the Court finds that Plaintiffs are entitled to prejudgment interest as of the date of the original filing.

For the foregoing reasons, Defendants' Motion for Judgment as a Matter of Law Under Rule 50(b), or, in the Alternative, for a New Trial, is **DENIED**, and Plaintiffs' Motion to Alter or Amend Judgment to Include Pre-Judgment Interest is **GRANTED.**

**IT IS SO ORDERED.**

_____
Sean P. Lugg, Judge

35